UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| | : | |
| Jefferson P. VanderWolk, Executor of the | : | |
| Estate of Walter W. VanderWolk, Jr. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:08-cv-00450-SM |
| | : | |
| Christopher Swenson, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

The Plaintiff seeks to recover from the Defendant the full amount of the estate tax it paid, $569,412.23, and has moved for summary judgment on its claim and Defendant's counterclaims.  Plaintiff is not entitled to relief as the Defendant's counterclaims against the Plaintiff serve as a complete defense against any amount that may have been recoverable.  Walter VanderWolk's breaches of his fiduciary duties renders his actions void, precluding recovery of the tax.

When Walter VanderWolk, as the Executor of the Estate of Sabra VanderWolk, made the QTIP election to treat Sabra's only parcel of real estate, the so-called Bald Peak Property, as non-taxable at that time, he improperly shifted the Bald Peak tax burden from his children to Christopher Swenson and he improperly increased the residue of Sabra's Estate that passed to the 1982 Trust, which was available for him and his children.  This election was in breach of Mr. VanderWolk's fiduciary duties to

Christopher Swenson and Walter's failure to notify Chris, particularly after telling Chris there would be no tax bill, was also a breach.  In arguing his point, the Plaintiff actually affirms that Walter acted in breach of his fiduciary duties and contrary to the intent of Sabra.  At the very least, there are numerous factual disputes to be resolved by the jury and the Plaintiff has failed to show entitlement to judgment as a matter of law.

## II.    FACTS

### A.    Sabra VanderWolk's Estate Planning

It is important when evaluating Walter VanderWolk's actions to consider and understand the history of Sabra's estate planning, because for most of her marriage to Walter, her wills and trust documents were prepared by Walter's lawyers, were executed simultaneously with revisions to Walter's estate planning documents, and mirrored Walter's wills and trusts.  However, in making her final Will in 1990, Sabra broke from over 20 years of estate planning and went to a lawyer who was associated with Sabra's family, to make a separate will.  In this 1990 Will, Sabra gave the Bald Peak Property to her son Christopher; this was a dramatic change, as the property had for the prior seventeen years since taking title been granted to a trust for the benefit of Walter and his children in all of Sabra's prior estate planning documents.

Sabra VanderWolk was Christopher Swenson's mother and she married Walter VanderWolk in the late 1960s when Chris was seven or eight years old.  See Exhibit A, Swenson depo. at 30-31.   Sabra Friend Swenson executed a Will on June 25, 1968, following her separation from her husband Jack Swenson and a Settlement Agreement with him in May 1968.  Exhibit B.  In the 1968 Will, Sabra left her Estate to her brothers to hold in trust for her son Christopher Swenson.

On September 15, 1970, Sabra VanderWolk executed a Will in which she directed that any assets received from her father be paid into a Living Trust for the benefit of Chris, and that the residue of her Estate be paid to Walter or if Walter predeceased her into a Family Trust for Walter's children. Exhibit C. There was no mention of assets from Sabra's mother. On that same date, Sabra executed a Trust Indenture (the so-called "Living Trust") that provided for income to her and, at her death, to her son Christopher Swenson. See Exhibit D. The Trustees of the Living Trust were Merchants National Bank, her husband Walter and Attorney William S. Green. See Exhibit D.

While married to Walter, Sabra took title to a lakefront parcel of real estate at the Bald Peak Colony Club in Moultonborough on October 3, 1973 when Chris was ten years old. Walter apparently provided the cash for the purchase, but his name was not on the deed.

On April 19, 1977, Sabra executed a new Will. See Exhibit E. In the 1977 Will, Sabra continued the direction of her father's assets to the Living Trust for the benefit of Chris and she directed the residue of her estate to the new Indenture of Trust created by Walter. See Exhibit E. Walter and Attorney William S. Green continued to be appointed as Co-Executors. In Walter's 1977 Indenture of Trust he left his assets to his children but nothing to Chris[1]. Exhibit F. Under these documents, Bald Peak would have flowed to Walter's children, although it was not specifically bequeathed.

On April 12, 1982, at the same time Walter executed a new Will, Sabra executed an updated Last Will and Testament. See Exhibits H (Sabra's) and I (Walter's). These documents were maintained by her husband's attorneys at Sheehan Phinney Bass &

---

[1] This was consistent with Walter's January 28, 1970 Will in which he left one-third of his Estate to Sabra but only if she survived him, and all other assets to his children. Exhibit G.

Green and Attorney Green was again appointed as Co-Executor of Sabra's Will with Walter. Exhibit H, p. 3, Article SEVENTH.

Sabra did not specifically provide for her son Christopher Swenson in the 1982 Will because, she noted, he was "amply provided for by my Living Trust dated September 1970, or otherwise."  See Exhibit H at p.5, Article ELEVENTH.  The 1982 Will directed that any monies received from Sabra's father, Robert Alonzo Friend, be paid to the Trustees of the Living Trust for the benefit of Chris.  See Exhibit H.  There was no mention of the Bald Peak property in the 1982 Will; it was thus to be included in the residue of Sabra's Estate.  In the 1982 Will, the residue was directed to the 1982 Trust.  Exhibit H at p. 2, Article FOURTH.

At the time of the 1970 Living Trust, Chris was seven years old.  Exhibit A, Swenson depo. at 11.  The Trust was funded with $10.  Exhibit D.  The Living Trust did not mention the Bald Peak property as Sabra had not yet taken title to it.  See Exhibit D.  The Living Trust merely set up a mechanism for Sabra to provide for her minor child in the event of her death.

The 1982 Trust contemplated the funding of a Marital Trust for Walter's benefit and a Family Trust for the benefit of Walter and his children from a prior marriage; Christopher Swenson was not a beneficiary of the 1982 Trust.  Exhibit J.  According to Sabra's final Estate Tax Return, the 1982 Trust was funded with $19,685.32 into the Marital Trust and $304,214.77 into the Family Trust.  Exhibit K.  The source of the $304,214.77 into the 1982 Trust was an inheritance Sabra received from her mother, who died May 9, 1997.  Exhibit L.

Walter's 1982 Will bequeathed his assets, including the personal residence in Bedford, to Sabra if she survived him, and otherwise to his children if Sabra did not survive him. Exhibit I. The residue was directed to a new trust also executed on April 12, 1982. Exhibit I. Walter left nothing to Chris. Consistent with Sabra's Will, Walter's 1982 Will contained a provision indicating he had amply provided for his children with the Trust created on that date. Exhibit I, Article NINTH.

On August 17, 1988, Walter executed a new Will. Exhibit M. In this new Will, Walter no longer provided for the payment of taxes as he had in his prior Wills, he gave his personal property to Sabra provided she survived him and to his children if she did not, and he directed the residue of his Estate to a new trust established on that date. In his 1988 Trust, Walter provided for more significant tax planning, including setting up separate trusts for his various children and specifically taking advantage of various tax exemptions. Exhibit N.

Sabra apparently did not execute a new Will in 1988 or a new trust in 1988. It appears Walter was engaged in more sophisticated and comprehensive tax planning, but that Sabra was not a part of it.

On September 13, 1990, Sabra went to see a new attorney to execute a new Last Will and Testament, Robert Varney of Wolfeboro. Attorney Varney was the attorney for Sabra's mother and at least one of Sabra's brothers. Sabra removed the Sheehan Phinney attorney as her Co-Trustee, leaving her husband as the sole Trustee and she named Robert Varney as the successor Trustee. Exhibit O.

Sabra made three important substantive changes in her 1990 Will. First, she directed the Bald Peak property to her son Chris; Bald Peak was no longer left to the

1982 Trust for Walter and his children. Second, she removed the provision indicating her belief that she had adequately provided for Chris in the 1970 Living Trust. Third, Sabra added Article FIFTH in which she directed that all property from her mother, including flat silver, jewelry and antiques, be given to Chris, to his surviving children, or to her nieces and nephew. Exhibit O.

Like the 1982 Will, the 1990 Will bequeathed to Chris any bequests that Sabra received from her late father Robert Alonzo Friend. The 1990 Will makes clear Sabra's intention was to keep her father's assets and important assets of her mother with Chris and his children, to keep them in her family. This included her mother's assets, which were mentioned for the first time.

In the 1990 Will Sabra directed that the rest, residue and remainder of her Estate be given, bequeathed and devised to the 1982 Trust. This was consistent with the 1982 Will, although the residue would no longer include the Bald Peak property. Sabra's mother, it turned out, left Sabra roughly $300,000 at her death and this was directed to the residue of the Will and thus into the 1982 Trust.

The changes in the 1990 Will reveal a clear intent to move away from her husband's law firm and to her family's lawyer, to distance herself from her husband's estate planning and to give more to her son Chris, who was now 27 years old in 1990.

There is no evidence that Sabra intended that Walter make the QTIP election with respect to the Bald Peak Property or that she intended that Walter would avoid estate taxes and shift the tax burden to Chris. The only direction Sabra provided was that her Executor "shall pay from the residue of my estate…all estate, inheritance, succession and other death taxes and duties occasioned by my death, whether incurred with respect to

property passing by this Will or otherwise" (emphasis added).  Exhibit O, Article FIRST.

While Sabra could specifically have added a QTIP election paragraph, she did not.

Sabra's 1990 Will contains none of the sophisticated planning seen in Walter's 1988 Will

and 1988 Trust.

### B.    Sabra's Expression of Her Intentions

Sabra told Chris that she had given him the Bald Peak Property, and she

specifically told Chris that she had arranged to leave it free of inheritance tax.  Exhibit P

(Swenson Interrogatory Answers, response to No. 2).  This testimony is admissible as

"the parol evidence rule does not preclude the use of evidence to prove fraud or

misrepresentation."  Ingaharro v. Blanchette, 122 N.H. 54, 56 (1982).  Also, the 1990

Will is ambiguous in its silence on how to handle the estate taxes associated with Sabra's

new grant of the Bald Peak property to Chris; it is appropriate to consider extrinsic

evidence.  In Re Pack Monadnock, 147 N.H. 419, 423 (2002) (citing Bartlett v Dumaine,

128 N.H. 497, 504 (1986).  The extrinsic evidence is not used to vary or contradict the

terms of the 1990 Will, but to assist in ascertaining Sabra's intent, which is to be

determined according to the surrounding circumstances and other competent evidence.

Id.

It is reasonable to infer from Plaintiff's arguments that Walter knew this was

Sabra's intention.  Plaintiff asserts Walter may not have known, when he told Chris in

October 1997 that there would be no tax liability for Chris, that he could make the QTIP

election and defer the tax to Chris.  Accepting this, the only reason Walter would have

said "no tax liability" at the time is he knew it is what Sabra wanted.  It was only later

then, after the Sheehan Phinney lawyers worked to prepare the estate tax return, that

Walter decided to make the QTIP election.  It is reasonable to infer, under Plaintiff's theory, that Walter was persuaded by the Sheehan Phinney lawyers to make the election. While it may have been good estate tax planning in theory, it was contrary to Sabra's intent and contrary to Walter's statement to Chris in October 1997.

Plaintiff appears to suggest that Sabra intended to insulate Walter's decisions from challenge and for Walter to be free of liability for breaching his fiduciary duty.  The plain language of the Will does not support Plaintiff's view.  Article ELEVENTH merely gave her executor the power to settle any tax dispute with a taxing authority; it did not give Walter unfettered power to shift the tax burden from one beneficiary to another. Article THIRTEENTH provides that a beneficiary may risk losing his or her interest if he or she challenged the execution of the Will; this provision simply does not apply to the actions of the executor as Plaintiff contends.  The entire paragraph is focused on the provisions of her Will, her Living Trust and her 1982 Trust, and <u>her</u> decisions as set forth in those documents; there is not a single mention of the actions of a trustee or executor in this section of the paragraph.  In fact, the final sentence contemplates no limitation on a challenge to the <u>construction</u> of her documents, which is the only possible reference to the actions of the executor.

### C.     Walter's Administration of Sabra's Estate

Following Sabra's death in October 1997, Walter and Chris discussed the property.  They were at the property a few days after Sabra's death, and discussing Sabra's will.  When discussing that the Bald Peak property would go to Chris when Walter died, Chris asked if there would be any current or future tax consequences associated with this transfer.  Walter told Chris there would not be any current taxes due,

as to future taxes when he (Chris) ultimately received the Bald Peak property there would be "no tax liability or big bills" associated with the Bald Peak property, beyond annual real estate taxes when Walter's lifetime tenancy ended, and that "the taxes had been taken care of." Exhibit P (Swenson Interrogatory Answers, response to No. 3).

It is now evident that, as Plaintiff admits, Walter made the QTIP election "[a]fter consulting with his estate-planning lawyer regarding minimization of estate taxes." Pl's Memorandum at 4 (emphasis added). Attorney Varney sent Sabra's Will, at Walter's request, to Attorney Ted Cain at Sheehan Phinney on October 30, 1997. Exhibit Q. Plaintiff's Privilege Log reveals numerous conversations between Walter VanderWolk and Sheehan Phinney commencing shortly after Sabra's death specifically involving the QTIP election, including late 1997, March 4, 1988 and March 18, 1988. Exhibit V. There was no communication from Walter or Attorney Cain to Chris that the QTIP election was going to be made and that this would subject Chris to a sizable tax bill after Walter's death.

During the administration of Sabra's Estate, Walter sought to reduce the bond he had posted, from $1,060,000 to $100,000. According to a memorandum from Attorney Varney's assistant, produced from Attorney Varney's files, Walter called Attorney Varney's office on September 24, 1998, requesting that Attorney Varney ask the Probate Court to reduce the bond and indicating that "Ted Kane (sic) is doing tax returns for estate taxes and NH tax. No tax due." Exhibit R. In his Petition to the Probate Court dated October 15, 1998, Walter indicated "no United States Estate Tax is due." Exhibit S. Chris was asked to sign an Assent to this Petition, which he did. Exhibit T. The representation that no estate tax was due was completely consistent with what Chris had

been told, but Walter did not contact Chris, or have his estate planning lawyer or

Attorney Varney contact Chris, to explain that the effect of no estate tax being due at that

time was that it would be due at the time of Walter's death and it would be owed by

Chris.

Walter used the Bald Peak property during his life and paid the real estate taxes

thereon and other bills related thereto, until 2007 when he turned the Bald Peak property

over to Chris and directed Chris to begin paying all of the bills, including the real estate

taxes.

At this time, in the Spring of 2007, Walter and Chris discussed in a telephone call

the use of the property in 2007 because Walter was no longer coming to New Hampshire

every summer and he was turning the property over to Chris.  Walter was in North

Carolina at the time.  Chris was assured again by Walter in this conversation, when Chris

asked about current and future tax implications of his receipt of the Bald Peak property,

that there would not be any taxes or big bills facing Chris when Walter died.  Exhibit P

(Swenson Answer to Interrogatory No. 4).  Plaintiff wrongly suggests that this 2007

conversation concerned the short term implications of Walter prematurely ending his life

estate in the property.  The context of Chris' testimony makes it evident that Walter was

affirming his 1997 "no tax liability" statements to Chris, as it was at this time that Chris

was taking over the property.  Exhibit A at 43-44.

While Walter was administering Sabra's estate, he was in consultation with his

attorneys at Sheehan Phinney about a cohabitation agreement and antenuptial agreement

with a woman whom he later married.  Plaintiff's privilege log reveals communications

regarding these subjects in April 1998 and December 1998.  Exhibit V.  Walter was clearly moving on and focusing on the preservation of his assets for his children.

## III.    ARGUMENT

### A.    Standard of Review

"Summary judgment is appropriate when the record reveals 'no genuine issue as to any material fact and…the moving party is entitled to a judgment as a matter of law.' Fed. R. Civ. P. 56(c).  'The role of summary judgment is to pierce the boiler plate of the pleadings and provide a means for prompt disposition of cases in which no trial-worthy issue exists.'  When ruling on a party's motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."  Cin-Doo, Inc. v. 7-Eleven, Inc., 2005 D.N.H. 58 (citations omitted).

### B.    The QTIP Election was in Breach of Walter's Fiduciary Duties

As the Executor of the Estate, Walter VanderWolk owed the duties of a Trustee to the Estate, its creditors and all of the heirs.  McInnes v. Goldthwaite, 94 N.H. 331, 334, 52 A. 2d 795 (1947).  See also 31 Am. Jur. 2d, Executors and Administrators § 363 ("the position of executor or administrator is a trust.  It is fiduciary in character and its holder is a trustee for all persons interested in the estate, and is held to the duties of a trustee").  See also Estate of Darrow, 467 N.Y.S.2d 114 (1983), cited by Plaintiff, holding "an executor owes a duty to *all* beneficiaries to be fair and impartial in all transactions that affect them; not preferring one to the detriment of others or conferring a benefit upon one at the expense of another."  There is no authority for the proposition advanced by the Plaintiff that Walter's duties extended only to the Estate.

It has long been recognized in New Hampshire that "[a]n administrator is a fiduciary.  Like any fiduciary, it goes without saying that an administrator must be loyal to the estate and to the creditors and beneficiaries of the estate.  Thus, it is improper for an administrator to advance a position that benefits one party interested in the estate over another."  DeGrandpre, 10 N.H.P., Probate and Administration of Estates, Trusts and Guardianships (4th Ed. 2008) (citing Tilton v. American Bible Soc'y, 60 N.H. 377 (1880)).  The Restatement (3d) of Trusts sets forth the specific duties a trustee owes a beneficiary:

> ### Duty of Loyalty
>
> "A trustee has a duty to administer the trust solely in the interest of the beneficiaries."  § 78(1).
>
> "The trustee is strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests."  § 78(2).
>
> "A trustee has a duty in dealing with a beneficiary to deal fairly and to communicate to the beneficiary all material facts the trustee knows or should know in connection with the matter."  § 78(3).
>
> ### Duty of Impartiality
>
> "A trustee has a duty to administer the trust in a manner that is impartial with respect to the various beneficiaries of the trust requiring that…in consulting and otherwise communicating with beneficiaries, the trustee must proceed in a manner that fairly reflects the diversity of their concerns and beneficial interests."  § 79(1)(v).
>
> ### Duty to Furnish Information to Beneficiaries
>
> A trustee owes a duty "to inform beneficiaries of significant changes in their beneficiary status" § 82(b) and
>
> A trustee owes a duty to keep beneficiaries "reasonably informed of…significant developments concerning the trust and its administration, particularly material information needed by beneficiaries for the protection of their interests.

§ 82(c).

Walter, in his handling of the QTIP election, failed to remain loyal to all of the beneficiaries, he failed to remain impartial and he failed to refrain from self-dealing, as he acted to benefit himself and his children over Christopher Swenson.  All of the reasons advanced by the Plaintiff to attempt to justify Walter's QTIP election confirm the impropriety of Walter's actions.

The Plaintiff suggests that Walter may have concluded it was fair for Chris to pay the taxes because Walter had paid for the Bald Peak property.  If that was actually Walter's thinking, then he allowed himself to place his family's interests over Sabra's intentions; there is no evidence Sabra gave any thought to making Chris pay for Bald Peak and no evidence she tried to take something from Chris to compensate Walter's family.  The Plaintiff suggests Walter may have concluded it was fair to shift the burden of the tax to Chris when the Bald Peak property was removed from the 1982 Trust and given to Chris.  If that is what Walter actually thought, he injected his sense of fairness as between Chris and Walter's children, which was not within the scope of his duties.  As Plaintiff recognizes, Walter was to carry out Sabra's intentions.  The Plaintiff asserts Walter, by using the Bald Peak property as QTIP property and avoiding the payment of $120,000 in estate taxes, properly maximized the funds going in the Family Trust.  That action did not benefit Chris in any way; it only benefitted Walter and his children at Chris' expense.

In a further effort to argue the propriety of Walter's election, the Plaintiff suggests one risk of not treating the Bald Peak property as QTIP property was that Walter's Estate would have paid an additional tax if Chris pre-deceased Walter.  Again, that is acting to

protect Walter's interests and those of his children at the expense of Chris. Even if that was a consequence of Sabra's decision to give Bald Peak to Chris tax-free, Walter was compelled to abide her decision. The Plaintiff also suggests that Walter may have wasted a portion of the $600,000 exemption. Any waste would be a burden on Walter and ultimately his children. Once again, if Sabra's decision left her Estate unable to fully exempt assets, Walter had no choice but to carry it out. It can hardly be said that Walter's decision was "disinterested."

Most alarmingly, Walter completely failed to provide Christopher Swenson with accurate information. Even accepting the Plaintiff's theory that Walter was not aware of the upcoming QTIP election in October 1997 when he first told Chris there would be "no tax liability or big bills," it can not be said that Walter continued under that impression. Walter was discussing it with his estate planning lawyers in April 1998 and he made the election in December 1998. He certainly knew by that time that the tax would not be paid out of the residue of Sabra's estate, but would be paid when he died and Chris took the remainder interest. Having worked so hard to justify Walter's decision and explaining how his decision made sense from estate planning purposes, the Plaintiff can not now contend that Walter did not know prior to December 1998 of the consequences of the QTIP election. The simple point remains that Walter had an obligation as a fiduciary to inform Chris that the information he provided Chris in October 1997 was no longer accurate and that when Chris took the property he would also be receiving a significant tax bill. Walter breached his duty by remaining silent and failing to correct his earlier statement.

If Walter was truly interested in fairness and fairly or equitably apportioning the tax burden, there were a number of viable options for him. Walter could have chosen not to include the Bald Peak property in the QTIP election or he could have chosen to evenly allocate the Bald Peak property with the 1982 Trust in the QTIP election. Instead, he chose the one outcome that maximized the funds from Chris' grandmother going into the 1982 Trust, that avoided any tax to be paid by his children and that increased the tax on Bald Peak from $120,000 to over $569,000. As a result, the 1982 Trust suffered no diminution in value while Chris' property loses half its estimated value (by paying the taxes). This preferential treatment constituted a breach of Walter's fiduciary duties, rendering his QTIP election void and making the Estate responsible for the tax.

Walter VanderWolk had several equitable ways to handle the taxes short of paying the $120,000 bill from the residue or fully deducting Bald Peak. He could have asked Chris to pay the $120,000 tax bill in 1998. He could have permanently sheltered the Bald Peak property by asking Chris to pay estate taxes on part of his $295,000 general devises. He could have made the entire 1982 Trust the subject of the QTIP election. Doing so would have meant that only $180,000 of the $500,000 value of the Bald Peak property had to be included as QTIP[2].

Walter could have made more of the 1982 Trust (and less of the Bald Peak property) subject to the QTIP election. As a fiduciary, Walter was under an obligation to act fairly with respect to all persons interested in Sabra's estate. In essence, Sabra's

---

[2] The amount for the Marital Trust is described as the lesser of: (X) the maximum estate tax marital deduction allowable, reduced by all other property passing to or for Walter and (Y) the minimum marital deduction necessary to reduce the estate tax to zero, after considering all credits. Since the marital deduction is unlimited, the first part would be all property passing to the 1982 Trust. The second part would be roughly $530,000, since there is no direction to consider other property passing to Walter. Since that amount is greater than the amount actually passing to the 1982 Trust, the first amount would apply, and the entire 1982 Trust should have been listed as QTIP property.

unified credit was used to shelter a portion of the assets going to Chris (the $295,000 of property that Chris received directly) and $304,000 of property that was to pass to Walter's children from the 1982 Trust (the entire amount).  A more fair result would be for each side to bear ultimate responsibility for $255,000 of beginning value[3].  Carried through, that would make nearly half of the Bald Peak property QTIP.  Alternatively, the benefit of the unified credit should have been allocated in proportion to the value received by each.  Here, Chris ultimately received $795,000 of value and Walter's children $324,000.  If the credit was applied in proportion, then roughly 70 percent of the unified credit ($420,000) would be applied to Chris' bequests, and would result in just 75 percent of Bald Peak as QTIP[4].

    Plaintiff's unsupported suggestion that a partial QTIP is questionable is misplaced. Partial QTIP interests are expressly authorized if, as here, the full interest qualifies. Regs. Sec. 20.2056-7(b)(2)(i) provides, "The election may relate to **all or any part of property** that meets the requirements of section <u>2056(b)(7)(B)(i)</u> (emphasis added)." Bald Peak met the requirements of the referenced section and thus qualified for a partial election. The example from the regulations cited by Plaintiff simply states the general rule, namely, if a QTIP election is made for the entire interest, then the full value is deductible.

    The idea that Walter could have considered it "fair" that Chris be stuck with the tax bill because: (a) Walter originally paid for the property or (b) its subsequent devise to Chris represented a change from her prior Will turns Walter's duty on its head; Walter was not to consider such factors as this made him partial and caused him to substitute his

---

[3] Because there is no way of knowing the future appreciation, and thus the value at Walter's death, the value in Sabra's estate is the only possible measure.
[4] Subtracting the outright bequest of $295,000 leaves $125,000 of Bald Peak value to be sheltered, which results in $475,000 (75%) in QTIP status.

judgment for Sabra's.  The impropriety of Walter's decision making on this is evident in Plaintiff's assertion that Chris "benefited disproportionately from the assets that passed through Sabra's estate."  Pl's Memorandum at 11.  It was not Walter's decision or his lawyer's decision to determine whether a benefit may have been disproportionate; it was Sabra's decision and she was entitled to bequeath her assets in any way she determined.  Indeed, this was the same plan developed by Walter, as his assets went to his children with nothing going to Chris.

Plaintiff relies on Attorney Boesch to advance its cause, but Attorney Boesch fails to address the critical issues.  Boesch merely approaches the case from the generic tax planning perspective, ignoring Sabra's intent that Chris not pay inheritance taxes on the Bald Peak devise, Walter's assertion to Chris that there would be "no tax liability," Walter's failure to correct his October 1997 misstatement, Walter's failure to inform Chris of the QTIP election and its consequences, Walter's shifting the tax burden from his children to Chris, and Walter's breach of his fiduciary duties to a beneficiary.  His opinions should be given little weight.  Boesch also speculates on what may have happened to the assets of the 1982 Trust, drawing the worst case scenario.  It is not true that handling the QTIP would have depleted the 1982 Trust or even the Family Trust portion of the 1982 Trust; there was several hundred thousand dollars remaining even after payment of the $120,000 tax on Bald Peak.  These examples solidify that Walter and his lawyers placed a higher priority, indeed, the only priority, on maximizing the monies flowing to Walter's children through the 1982 Trust, which could only be done at Chris' expense.  Rather than absolving Walter, the Boesch report supports the counterclaims.

**C.    Walter Intentionally, and at a Minimum Negligently, Misrepresented the Material Facts to Christopher**

Plaintiff contends there was no misrepresentation made in October 1997 because there is no evidence Walter knew or should have known of the QTIP election.  Plaintiff misses the point; whether Walter knew or should have known of the QTIP election in October 1997 is not the important question.  When Walter told Chris he was going to receive the Bald Peak property and that there would be "no tax liability or big bills," he spoke as the Executor and with an air of authority.  If Walter truly did not know of the QTIP election in October, he certainly knew of it before the tax return was filed in December 1998, yet he said nothing to Chris to correct his earlier misstatement.  In Ingaharro v. Blanchette, 122 N.H. 54, 57 (1982), the New Hampshire Supreme Court held that when a person "makes a representation and later learns that the statement is false he must reveal the learned information to the [other person]."  Walter never corrected the statement he made in October 1997, which makes the statement a misrepresentation.

It was also a negligent misrepresentation if Walter did not positively know there would be no tax obligation on Chris, as the Plaintiff suggests.  "It is the duty of one who volunteers information to another not having equal knowledge, with the intention that he will act upon it, to exercise reasonable care to verify the truth of his statements before making them."  Patch v. Arsenault, 139 N.H. 313, 319 (1995); see also Snierson v. Scruton, 145 N.H. 73, 78 (2000).  Placed in its best light, Walter plainly did not exercise reasonable care to verify the truth of his "no tax liability" statement to Christopher.

Plaintiff also contends even if there was a misrepresentation, there was no reliance.  The testimony, however, is clear that Chris accepted what Walter VanderWolk

said because he "trusted him," and Chris did not press Walter on why there would be no taxes. Exhibit A at 34. Chris did speak twice with Attorney Varney in 1997 after his mother died, and he asked Attorney Varney "are there any taxes or anything I've got to worry about?" and Attorney Varney said no, confirming what Walter had said. Exhibit A at 37. Chris possessed a number of viable options to address the tax situation if Walter had told him the truth at any point prior to filing the tax return with the QTIP election in December 1998. Chris could have sought to intervene in the Probate Court for an order preventing Walter from making the QTIP election as he intended. Chris could have sought a Probate Court order requiring Walter to allocate more of the 1982 Trust and less of the Bald Peak property as QTIP property, for a more equitable or proportionate result. Chris could have sought an order compelling the payment of the $120,000 tax bill out of the residue of the Estate, or for permission to pay the taxes himself, which would have been savings to him of nearly $430,000. While it may have been an extreme remedy, removal of Walter and insertion of an unrelated executor was possible, and Chris could have sought the appointment of a truly disinterested executor to file the tax return. Chris could have sought permission to file the tax return on his own. Walter denied Chris all of these options by failing to correct his misstatement and by failing to inform Chris that he was going to make a QTIP election that would leave Chris with a large unanticipated tax bill at Walter's death.

Plaintiff contends that Chris failed to act with due diligence, suggesting Chris saw the estate tax return "around the time of [Sabra's] death." Pl's Memorandum at 21. This is preposterous as the tax return was filed December 21, 1998, over 14 months after Sabra's death. Plaintiff also mischaracterizes the deposition testimony; Chris Swenson

testified "I'm sure I did.  I don't remember.  If I did, I didn't look at it that closely."

Exhibit A at 51-52.  When asked if he was provided a copy of the tax return Chris

answered "I don't know if I was.  I don't know."  Id. at 52.  It is wrong to suggest that

Chris should have done more to find out if he would really owe a tax.  First, the decision

was going to be made by Walter when the tax return was filed.  Second, there was no

duty imposed on Chris to investigate the accuracy of Walter's misstatement, which was

peculiarly within Walter's knowledge as the Executor.  Bergeron v. Dupont, 116 N.H.

373, 375 (1976).  Walter did advise Chris to call Attorney Varney, who prepared the

Will, but Attorney Varney was not Walter's attorney preparing the tax return; it was

Sheehan Phinney.

In the end, had there been full disclosure of accurate information by Walter, Chris

could have pursued a family settlement in which the interested parties (Walter, Chris and

Walter's children) could have agreed on how to handle the taxes.  A family settlement

would have been highly appropriate.  See 31 Am. Jur. 2d, Executors and Administrators §

48 ("the overwhelming weight of authority looks with favor upon an agreement among

members of a family to settle disputes").

As the material facts are disputed on the misrepresentation claims, the claims

must go to trial.

### D.    The Estate Should be Estopped from Recovering the Tax Paid

The doctrines of promissory estoppel and equitable estoppel bar recovery of the

tax.  "A promise which the promissor should reasonably expect to induce action or

forbearance on the part of the promissee or a third person and which does induce such

action or forbearance is binding if injustice can be avoided only by enforcement of the

promise.  The remedy for breach may be limited as justice requires."  <u>Cin-Doo, Inc. v. 7-</u>

<u>Eleven, Inc.</u>, 2005 D.N.H. 58.  <u>See</u> <u>also</u> <u>Jackson v. Morse</u>, 152 N.H. 48, 52 (2005).

"Equitable estoppel 'serves to forbid one to speak against his own act,

representations, or commitments to the injury of one to whom they were directed and

who reasonably relied thereon.'"  <u>In Re Stanton</u>, 147 N.H. 724, 729 (2002) (quoting <u>Town</u>

<u>of</u> <u>Seabrook v. Vachon Management</u>, 144 N.H. 660, 666 (2000)).  "The four necessary

elements for estoppel are: first, a false representation or concealment of material facts

made with knowledge of those facts; second, the party to whom the representation was

made must have been ignorant of the truth of the matter; third, the representation must

have been made with the intention of inducing the other party to rely on it; and fourth, the

other party must have been induced to rely upon the representation to his or her injury."

<u>Id</u>. at 729-730 (quoting <u>Town of Seabrook v. Vachon Management</u>, 144 N.H. at 666).

"The existence of estoppel is a question of fact to be resolved by the trier of fact."  <u>Id</u>. at

730.

Walter's "no tax liability" statement and promise that the taxes had been paid,

both in 1997 and 2007, upon which Chris relied to his detriment by accepting the truth of

what Walter told him, are worthy of enforcement.  Christopher Swenson is entitled to a

jury determination of whether the facts are sufficient to prove equitable estoppel.  The

measure of damages is the amount of the tax sought by the Plaintiff.

### E.    The Estate was Unjustly Enriched by Walter's Actions

"Unjust enrichment may exist when an individual receives a benefit as a result of

his wrongful acts, or when he innocently receives a benefit and passively accepts it."

<u>Petrie-Clemons v. Butterfield</u>, 122 N.H. 120, 127 (1982).  Walter's Estate, and his

children as beneficiaries, were unjustly enriched by Walter's actions. They received the $304,000 from Sabra's mother when a portion of that inheritance was supposed to be used to pay the Bald Peak taxes. Plaintiff's suggestion that this result is not unjust, because Chris received the Bald Peak property, is misplaced. Sabra's intent and her assessment of fairness is controlling, not Walter's notion or Plaintiff's idea of fairness. The history of estate planning of Walter and Sabra was to leave what they owned to their children and nothing to the others. The diversion of Chris' grandmother's assets to Walter's children is plainly unjust.

### F. The Counterclaims are Timely

The Plaintiff contends, without support, that the breach of fiduciary duty claim was brought beyond the three-year statute of limitations. The claim did not accrue until the Plaintiff paid the $569,412.23 in October 2008 and made demand on the Defendant for reimbursement, as it was not until that time that Christopher Swenson suffered an injury. RSA 508:4,I provides the three-year limitation period does not begin to run until "the injury and its causal relationship to the act or omission" were discovered. Conrad v Hazen, 140 N.H. 249, 251-52 (1995). Additionally, the doctrine of fraudulent concealment prevents Plaintiff from asserting the statute of limitations as a defense, as Walter concealed from Chris that the tax would be imposed on Chris at Walter's death. Id. Walter did not share with Chris his QTIP election, his own estate planning or his discussions with his estate planning lawyers. The amount of the tax due would not be known until Walter passed and his estate tax return was filed and Walter had the ability to instruct his executor not to seek reimbursement from Chris for the tax paid. Under these circumstances, no claim accrued prior to the payment of the tax by Plaintiff and the

demand for reimbursement; it would be legally incorrect and also inequitable to apply the statute of limitations as urged by the Plaintiff.

The requirement in RSA 556:1 does not apply where the claim is one in recoupment in an action brought by the Administrator.  <u>Stanley v. Clark</u>, 159 F. Supp. 65 (D.N.H. 1957).  Even if that were not the case, the demand was timely made.  "The primary purpose of [RSA 556:1's] exhibition and demand provision is to bring a claim to the attention of the administrator so that he may make further inquiry into it with a view to its orderly and expeditious adjustment and settlement."  When the claim for reimbursement of the taxes was made to Christopher Swenson in March 2008, a dialogue ensued between Jeffrey VanderWolk and Chris Swenson.  The essence of Chris' position, that he did not owe the tax, was conveyed in a July 15, 2008 letter to Mr. VanderWolk. Exhibit U.  This was more than sufficient notice to the Estate.  Even if it was not, the parties were discussing throughout the spring and summer whether Chris was going to pay the tax and why he should not have to pay the tax.  Keeping in mind the purpose of the statute, the absence of prejudice to the Plaintiff, and the Plaintiff's awareness Chris believed he did not owe the tax, Defendant is entitled to the benefit of RSA 556:28, should the Court find a formal demand was not timely made.

## IV.    CONCLUSION

For the foregoing reasons, summary judgment for the Plaintiff is not appropriate. The material facts are disputed and the Plaintiff has failed to show he is entitled to judgment as a matter of law.  Walter breached his duties and misrepresented the materials facts to Chris when he made the "no tax liability" statement in October 1997, when he failed to correct that misstatement, and when he made the QTIP election to maximize the

funds going to the 1982 Trust for the benefit of his children.  Christopher Swenson

requests the Court deny Plaintiff's Motion for Summary Judgment and hold a trial in this

matter.

Respectfully submitted,

CHRISTOPHER SWENSON

By its attorneys,

PRETI, FLAHERTY, BELIVEAU
& PACHIOS, PLLP


Dated: October 19, 2009               By: /s/ Peter G. Callaghan
                                      Peter G. Callaghan, NH Bar # 6811
                                      P.O. Box 1318
                                      Concord, NH 03302-1318
                                      (603) 410-1500
                                      pcallaghan@preti.com


### CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October 2009 a copy of the foregoing
*Defendant's Memorandum of Law* was forwarded to all parties of record electronically
via ECF.


/s/ Peter G. Callaghan
Peter G. Callaghan